**COLLEGES AND UNIVERSITIES**

UNIVERSITY OF MARYLAND SYSTEM — ZONING AND PLANNING —
     COUNTIES — UNIVERSITY MAY LEASE PROPERTY FOR USE
     AS A FRATERNITY HOUSE DESPITE LOCAL ZONING
     PROHIBITION

May 25, 1993

*The Honorable James C. Rosapepe*
*Maryland House of Delegates*

You have asked our opinion on the extent to which real property owned by the University of Maryland in residential neighborhoods is subject to local zoning control. More particularly, your inquiry is whether the University may lease its property to private persons for a use not generally permitted in the area under the county zoning ordinance. The use at issue is the operation of a fraternity house.

For the reasons given below, we conclude as follows:

(1)   The University may lease State property to a private person, including a corporation, for a use not permitted under local zoning regulations so long as the University is acting to further a "public purpose."

(2)   The lease of State property by the University of Maryland to a private corporation for use as student housing, in the form of a fraternity house, serves a "public purpose."

**I**

**The Property**

In April 1990, the University of Maryland at College Park recommended to the Board of Regents of the University of Maryland System the purchase of property located at 7512 Princeton Avenue in College Park, Prince George's County (the "Property"). The

Property, consisting of a detached two-story house on approximately 0.4 acres of land, is directly contiguous to the University. It is bounded to the north by State property commonly known as the University's "Fraternity-Sorority Row" and to the west by State property used as offices for the University's Department of Environmental Safety. It is bounded on the south by a privately owned residence operated as a boarding house. To the east, directly across the street, are two privately owned buildings operated as fraternity houses.

The University proposed to purchase the Property for temporary use as overflow office space and for student housing. Memorandum from William E. Kirwan, President, University of Maryland at College Park, to James A. Norton, Chancellor, University of Maryland System (April 27, 1990). The Board of Regents and the Board of Public Works approved this project, and the Property was thereafter acquired by deed dated June 20, 1990. The State holds title to the Property for the use of the University of Maryland System.

From June 1990 through December 1991, the University used the Property as offices. Then, on August 1, 1992, the University entered into a one-year lease agreement with the Kimball Housing Corporation, a private company, as tenant.[1] The lease restricts use of the Property to student members of the University of Maryland Chapter of the Delta Chi fraternity. Eight student members of the fraternity presently occupy the premises.

By action of Prince George's County, and prior to the time of its purchase by the University, the Property was zoned as "R-55." Section 27-430 of the Prince George's County Code titles this designation as "One-Family Detached Residential." Section 27-441

---

[1] The University requires each fraternity or sorority that occupies University property to be represented by a corporation, known as the "House Corporation," organized and in good standing under Maryland law. This requirement ensures continuity in the University's contractual control over the property. The Kimball Housing Corporation is the "House Corporation" of the Delta Chi fraternity.

sets forth four allowed uses for R-55 property. Use as a fraternity or sorority house, however, is specifically prohibited.[2]


## II

### Applicability of Zoning Regulations to
### The University of Maryland

Numerous Opinions of the Attorney General affirm the fundamental doctrine that operations of State government are not subject to control by local governments absent an express statutory provision that they shall be so controlled. *See, e.g.*, 73 *Opinions of the Attorney General* 238 (1988); 62 *Opinions of the Attorney General* 941 (1977); 55 *Opinions of the Attorney General* 286 (1970). This immunity derives from the sovereign character of the State:

> [F]undamental principles of state sovereignty require that the State be free from local regulation of any character unless the State has indicated an express intention that it will be subject to such regulation. The underlying bases for this doctrine of state sovereignty are that different considerations exist between laws applicable to the citizens at large and laws applicable to the State itself, and, therefore, that laws applicable to the citizens at large will not be deemed to be applicable to the State itself unless such a specific intention is evident in the particular legislation; and that counties and municipalities are creatures of the State, subject always to State law and State policy, and that the State itself will not be subject to regulation by its subdivisions unless, again, the State has provided for this

---

[2] The one exception, a grandfather provision applicable to fraternity and sorority houses legally existing prior to May 20, 1983, is not relevant to this inquiry.

regulation by specific language in the legislation.

58 *Opinions of the Attorney General* 512, 515-16 (1973).

This principle is frequently encountered in controversies associated with land use. It is well established under Maryland law that when the State uses its property for governmental purposes, county and municipal zoning codes are not applicable, unless the General Assembly's grant of zoning authority to the county includes an express statement or a clear implication that State property will be subject to local control. *Mayor and City Council of Baltimore v. State*, 281 Md. 217, 378 A.2d 1326 (1977). The State's exemption from county zoning laws extends to its agencies and instrumentalities. *Board of Child Care v. Harker*, 316 Md. 683, 561 A.2d 219 (1989).

The University of Maryland has long been recognized as an agency and instrumentality of the State, partaking of its sovereignty and immunities. *University of Maryland v. Maas*, 173 Md. 554, 197 A. 123 (1938). Consequently, because the acts of the General Assembly from which Prince George's County derives its planning and zoning powers do not specifically mention the State or disclose a clear intention to subject it to local regulation, the Attorney General previously determined that the University is not subject to the zoning laws of Prince George's County. In a 1973 opinion, Attorney General Burch wrote as follows:

> We have examined the acts of the General Assembly establishing the Maryland-National Park and Planning Commission and we find no language indicating an intention that the State shall be bound by the zoning regulations enacted by the Prince George's County Council, sitting as a District Council for the Maryland-Washington Regional District.... Therefore, we conclude that the University of Maryland is not subject to the zoning laws of Prince George's County.[3]

---

[3] Prince George's County acquires planning and zoning powers from
(continued...)

58 *Opinions of the Attorney General* 538. The Attorney General reached a similar conclusion in 59 *Opinions of the Attorney General* 695 (1974). These considerations lead us again to affirm the conclusion that in its use of State property, the University is immune from the County's zoning restrictions.

Beyond this general rule, however, the question arises whether the immunity continues when State property is leased to a private entity. In the present case, the University has leased the Property to a fraternity.

## III

### "Public Purpose" Analysis

State property leased to a private party remains immune from county and municipal zoning laws when the use to which it is put serves a "public purpose." 73 *Opinions of the Attorney General* 238, 240 (1988).

A leading case, *City of Baltimore v. State Dep't of Health & Mental Hygiene*, 38 Md. App. 570, 381 A.2d 1188 (1978), illustrates application of the rule under circumstances quite similar to the present inquiry. The State Department of Juvenile Services ("DJS") had been created and mandated by statute to develop "programs for the predelinquent child whose behavior tends to lead to contact with law-enforcement agencies." To achieve that purpose, DJS was authorized to establish, maintain, and operate such facilities as might be needed, and to place children in group homes. DJS purchased a home in a residential neighborhood. It then leased the house to the Campfire Girls Council of the Chesapeake, Inc., a private entity. The purpose of the lease was to provide the Campfire Girls Council with facilities to operate a home for teenage girls who had been

---

[3] (...continued)
laws establishing the Maryland-National Capital Park and Planning Commission. *See* Article 28, §8-101 of the Maryland Code. The County Council may regulate land use in its capacity as a District Council for the Maryland-Washington Regional District of the Planning Commission. *Prince George's County v. Maryland-National Capital Park and Planning Commission*, 269 Md. 202, 306 A.2d 223 (1973).

adjudged as "children in need of supervision."  Upon complaint and appeal of the surrounding property owners, the Baltimore Board of Municipal and Zoning Appeals denied the Campfire Girls an occupancy permit, which was required under the city's zoning ordinance.  The Board concluded that the proposed use "would menace and endanger the public health, security, general welfare and morals."

The State appealed to the Baltimore City Court, which reversed on the ground that "the purpose of the use of the State-owned house was a public purpose and that the Board had no jurisdiction over the issuance of the permit in the first instance."  The Court of Special Appeals agreed:

> At the outset, we [make] manifest that the law is that a municipality may not exercise zoning jurisdiction over State-owned and used property unless the State has subjected itself to the authority of the municipality.
>
> If the issue before us were one of the State's property being leased to a private party for private use, we would have given the matter short shrift because we have already resolved that question ....
>
> [The Baltimore City Court] was of the view that the use made of the property in the case sub judice was public, and that it served a public purpose.  We fully agree.

38 Md. App. at 574-75 (citations omitted).

On the issue of "public" use, it was persuasive to the Court that the General Assembly had spoken on the matter, establishing DJS for the purpose of educating, training, and rehabilitating teenage children, and authorizing it to operate facilities for this purpose.  In addition, the Court looked to the nature of the use in relation to a calculated benefit to a larger public, noting that the services provided to the children individually redounded to the benefit of the public generally:  "Hopefully, such a program will turn a [child in need of supervision] from any desire to pursue errant ways into a responsible and productive member of society."  38 Md. App. at 577.

Applying these principles to the present inquiry, we conclude that the Property will remain immune from County zoning if by lease of the Property to the fraternity the University is undertaking to advance a "public purpose."

The courts have remarked that there is no one definition of the phrase or a single analytical approach to be utilized in determining whether a specific use is public or private. In fact, "public use," with slight variation in emphasis, is an operative phrase in at least four different types of governmental action: zoning, eminent domain, tax, and public indebtedness. Courts applying the test in one area often work by analogy and borrow precedent from another. *See, e.g., Prince George's County v. Collington Crossroads, Inc.*, 275 Md. 171, 190 n.6, 339 A.2d 278 (1974).

The Court of Appeals has doubted the wisdom of endeavoring to formulate a general rule. "Moreover, even if it were possible to formulate such a rule, it would probably not be prudent to do so." 275 Md. at 181. Nevertheless, our reading of the case law leads us to conclude that the determinative consideration is the "public" quality of the predominant purpose motivating the use of the property – of the ends desired to be achieved.[4]

Writing in a condemnation case, the Court of Appeals observed that when the General Assembly has determined a proposed undertaking to be public in nature, "'the *prima facie* presumption is that the use thus declared to be public is in fact public.'" *Anne Arundel County v. Burnopp*, 300 Md. 343, 348, 478 A.2d 315 (1984) (quoting *Murphy v. State Roads Commission*, 159 Md. 7, 15, 149 A. 566 (1930). Additional factors like the extent of continuing State control over the property and the likelihood of private persons being otherwise unwilling to undertake the same venture lend weight to a finding of "public use." *Prince George's County v. Collington Crossroads, Inc.,* 275 Md. at 181. Moreover, a use that facilitates or is incidental to a recognized "public use" is itself a "public use."

---

[4] This office has previously concluded that the State's immunity from local ordinances is "not rooted in its ownership or occupancy of property but in the nature of the function performed." 62 *Opinions of the Attorney General* 45, 49 (1977).

Conversely, Maryland courts have repeatedly rejected analyses that attempt to focus on the person most immediately benefiting from the State's action − for example, upon the legal character or exclusivity of the party being given use of State property. "There are many State-owned facilities where the public, in the sense of the average citizen, has 'no right to enter' absent a special permission received from competent authority." *City of Baltimore v. State Dep't of Health & Mental Hygiene*, 38 Md. App. at 576. The court offered such examples as penal institutions, reserved areas in courthouses, the Comptroller's office, and National Guard facilities. Nonetheless, it noted, all of these properties are in "public use."

Similarly, in a challenge to Baltimore's condemnation of property on the Patapsco River for use in harbor development, the Court of Appeals stressed that the "public use" limitation in eminent domain power does not literally mean in all cases "use of the public." It stated:

> The development of the harbor of Baltimore according to a comprehensive plan, by which the commerce of the port will be most advantageously served, and its future growth encouraged, is a project of distinctively public interest and purpose.... The public character of the use to which the harbor structures are devoted is not affected by the fact that they may not all be made available for the indiscriminate use of the public.

*Marchant v. Baltimore,* 146 Md. 513, 521, 126 A. 884 (1924).

"[T]hat the property ... will be put into private hands does not destroy the public character of the [action] as [it] may accomplish a proper public benefit." *Herzinger v. Mayor of Baltimore*, 203 Md. 49, 60, 98 A.2d 87 (1953). The fact that State property will be leased or conveyed for the exclusive use of a private entity does not alter this result. Thus, in the harbor expansion case of *Marchant v. Baltimore* discussed above, the Court was constrained to add:

> By the allocation or lease of certain docks for the separate use of persons or corporations having a regular or continuous need of such conveniences, the city does not convert into a

> private use the public port service which is
> thus in part provided.... [T]he use remains
> consistent with the public purpose for which
> the port accommodations as a whole are
> maintained.

146 Md. at 521.[5]

"Merely because private businesses or private persons will also receive benefit ... does not destroy the public character of the action." *Prince George's County v. Collington Crossroads*, 275 Md. at 187. Inevitably, many acts of government result in some immediate advantage or extra benefit for some person or group. Thus, in a condemnation case, the Court observed: "[W]here private use or benefit resulting from the exercise of eminent domain is merely incidental or secondary to the primary public purpose underlying the taking, the condemnation action is not unlawful." *Mayor and City Council of Baltimore v. Chertkof*, 293 Md. 32, 43, 441 A.2d 1044 (1982).

Finally, "the fact that the government may be getting involved in an area which was formerly the domain of private enterprise does not require a conclusion that the taking is not for a public use." *Prince George's County v. Collington Crossroads,* 275 Md. at 185. *See also Riden v. Philadelphia, B. & W. R.R. Co.,* 188 Md. 336, 342-43, 35 A.2d 99 (1943).

Having concluded that the focus of "public use" inquiry is properly upon the presence of a recognized "public" purpose

---

[5] *New Central Coal Co. v. George's Creek Coal & Iron Co.* 37 Md. 537 (1873), also demonstrates the point well. *New Central Coal* was a landowner's challenge to condemnation of property to build a railroad spur. The only use to be made of the track was to transport coal from a private business to the mainline. Nevertheless, the Court found this to be a "public use." It viewed the question of public purpose broadly, noting the settled policy of the State to stimulate enterprise and encourage combinations of capital for developing its mineral resources. The Court wrote: "To furnish the requisite facilities for the construction of railroads for the successful operation of the mines is therefore, in some sense, a public necessity, and that being so, the use of the ways for such roads may well be said to be public." 37 Md. at 560.

motivating a State action, we next assess the University's lease to Kimball Housing Corporation from this perspective.

### IV

### Lease of the Property to a Private Fraternity as a "Public Use"

There can be no dispute that providing an opportunity for higher education has been viewed historically as a "public purpose." *See* Chapter 159 of the Laws of Maryland 1812 (Charter of the University). To ensure the success of this mission, public colleges and universities may undertake projects they deem "necessary and convenient" to accomplish it. 59 *Opinions of the Attorney General* at 258-59.

The College Park campus has approximately 32,000 registered students. Providing a place for those students to reside is clearly necessary to accomplish the University's purpose − indeed, it is prerequisite to delivery of its educational services. In fact, historically, "university" and "housing" have never been distinct concepts; the word "college" traditionally meant a place of residence for students:

> The settled meaning of "college" [is] a building or group of buildings in which scholars are housed, fed, instructed and governed under college discipline, while qualifying for their university degree.... This peculiar function of a college is inherent in the best conception of the university. This meaning has been attached to the English word for 800 years; it was the only meaning known at the time our first American colleges were founded.

*Yale University v. Town of New Haven*, 71 Conn. 316, 42 A. 87, 91 (1899). *See also President of Harvard College v. Assessors of Cambridge*, 175 Mass. 145, 55 N.E. 644, 645 (1900) ("The history of Harvard College, and of like institutions, shows, we think, that from the beginning dormitories and dining halls have been furnished by the college for the use of students, and have been regarded as

devoted to college purposes."). Rejecting an argument "that the dormitories, the dining hall, and [a] club house ... are not used in the immediate conduct of the educational purposes" of the University of Chicago, the Illinois Supreme Court wrote as follows:

> All these uses are in the immediate carrying on of the educational purposes of the university. For hundreds of years the dormitories and the dining halls have been an essential part of universities and colleges. When the American colonies began founding universities and colleges, the first step was the erection of buildings for lodging and feeding the students while they pursued their studies under the supervision of the college authorities....

*City of Chicago v. University of Chicago,* 228 Ill. 605, 81 N.E. 1138, 1139 (1907).

The necessary association of housing with teaching is certainly the case at the University of Maryland, which seeks to attract talented students from across the State and nation. In order to attend the College Park Campus, well over half of its students have left home; they need a place to live that is convenient to their classes. Addressing this point with respect to the University of Florida, the Florida Supreme Court wrote:

> Classrooms, assembly halls, libraries, chemistry and scientific laboratories and dormitories constitute a part of the physical properties necessary for a university to perform its public functions and duties. When an institution such as the University of Florida accepts students from all parts of the State, it is as much of a duty of the ... University to make available dormitories, meeting places and eating places, as it is to make available classrooms and laboratories.

*State v. Board of Control,* 66 So. 2d 209, 211 (1953). The same is no less true at the University of Maryland. Thus, we conclude that

the use of State property to house its University students is a "public" use.

The General Assembly's recognition of that "public" need and use, as well as the resultant present configuration of University student housing, began during the College Park Campus' rapid expansion in the early 1950's. Accordingly, the Legislature authorized the construction, operation, and maintenance of additional housing facilities. Of particular interest is Chapter 61 of the Laws of Maryland 1950, which "created a body corporate and politic, to be known as the University of Maryland Building Authority ...."[6] The Authority was authorized "[t]o construct ... three dormitories, [and] ten other housing units for fraternities and sororities ...." Moreover, the General Assembly expressly declared that "[t]he exercise of the powers granted by this sub-title will be in all respects for the benefit of the people of the State, for the increase of their education and prosperity, and for the improvement of their health, living conditions and general welfare, and ... the operation and maintenance of projects by the Authority will constitute the performance of essential governmental functions ...." Former Article 77, §235G.

Student housing shortages nonetheless persisted. Endeavoring to relieve this pressure, the University added to its residential facilities, continuing the mix of dormitories and fraternity/sorority houses. Presenting a policy that the Board of Regents adopted on April 11, 1957, President Wilson H. Elkins reported to the Board as follows:

> [F]rom 10 to 15 fraternities and sororities that are already established at the University of Maryland do not have adequate housing. If there is any way in which the University can help in securing houses for these groups, it would aid in meeting the increased number of students coming to the University....

14 *Minutes of the Board of Regents* at 3341 (1957). In 1961 the Regents determined to use a portion of the University's endowment

---

[6] Chapter 629 of the Laws of Maryland of 1951 transferred this authority to the Board of Regents of the University of Maryland.

fund to build additional student housing in the form of sorority houses.  Speaking for a majority of the Endowment Committee, Regent Tuttle noted:

> This policy involves a determination as to how helpful it is to the University and its housing problems to have dormitory and eating facilities provided at a comparatively low cost.  It is understood that an average of thirty-four students would be cared for in each [sorority] house.

Despite this advantage, he observed that it was unlikely fraternities and sororities themselves could obtain the necessary bank loans to construct such facilities; he concluded:

> In my thinking I am not at all influenced by whether or not such a transaction is a favor to the sorority.  It is my view that the acquisition of such facilities reduces the emergency caused by shortage of living facilities on the campus.

17 *Minutes of the Board of Regents* at 53 (1961).

In 1965 and 1967 the General Assembly revisited the need for student housing.  For example, the title of Chapter 538 of the Laws of Maryland 1967 reads in relevant part:

> AN ACT ... authorizing the University of Maryland to acquire, construct, equip, maintain, repair and operate one or more buildings, including real property and interests therein, *to provide additional housing units, and living accommodations* which may include such facilities as eating facilities, recreational facilities, student facilities, student union buildings, additions to existing student union buildings, and/or combined housing and student facilities, for students, graduate and undergraduate, and their

families, if married, enrolled at the University
of Maryland ....

(Emphasis supplied.)  Among other things, the Act empowered the University to "convert existing facilities to serve as housing units ...." And as it did in previous legislation, the Legislature affirmed the "public purpose" thereby accomplished, stating the provision of such housing was "in all respects for the benefit of the people of this state, for the increase of their education and prosperity, and for the improvement of their health, living conditions and general welfare, and ... the operation and maintenance of said facilities and accommodations by said University will constitute the performance of essential governmental functions ...."   Former Article 77, §259AA.

(Emphasis supplied.)   The General Assembly also directed its attention to student housing in Chapter 537 of the Laws of Maryland 1984, in which it authorized the University to "[a]cquire, construct, reconstruct, equip, maintain, repair, renovate, and operate auxiliary facilities at any of its campuses ...." These "auxiliary facilities" were defined as:

> [A]ny facility or facilities now existing or hereafter constructed or acquired, which furnish a service to students, faculty, or staff at the University; such facilities shall include (but shall not be limited by type or class or otherwise to) *housing facilities*, eating facilities, recreational facilities, campus infirmaries, parking facilities, athletic facilities, student union or activity facilities, or any combination of such facilities.

(Emphasis supplied.)  As before, the Act affirmed that the operation and maintenance of these facilities was for the benefit of the people of the State and constituted the performance of essential governmental functions.

In the present case, the Property was purchased to become a component of the University's student housing system.  It was leased to the Kimball Housing Corporation to house students.  It has been integrated into the Campus' housing system and now serves that purpose.  Through conditions in the lease and rules governing

student behavior, the University maintains a degree of control over the Property similar to other dormitories. We conclude, therefore, that the use of the Property is a "public use."

Because under Maryland law the determinative consideration in a question of "public use" is the "public" quality of the purpose motivating the State's use of property, the fact that a private organization, a fraternity, is tenant is irrelevant. In this assessment, we would note the analysis of the Florida Supreme Court in *State v. Board of Control,* where the court focussed on the same issue, using a "public purpose" approach similar to Maryland's. The "public purpose" in dispute was the University of Florida's plan to construct several small dormitories for lease to fraternities. The challenge asserted that this plan would further a "private," not a "public" purpose, because private fraternities would be the benefitting occupants. The court rejected this contention. Instead, it directed attention to the "real and dominant purpose" of the project. It ruled:

> The fallacy of this argument is the contention that the student living groups will necessarily be private corporations, associations or organizations, or that the financing and erection of such dormitories will serve the interest or purpose of such private corporation, association or organization, or the members thereof.
>
> . . .
>
> The mere fact that some one engaged in private business for private gain will be benefitted by every public improvement undertaken by the government or a governmental agency, should not and does not deprive such improvement of its public character or detract from the fact that it primarily serves a public purpose.
>
> . . .
>
> The predominant, primary and essential purpose is to provide the students at the

University of Florida decent dormitories or
other facilities, which is essentially a public
purpose.

66 So.2d at 210-12. In our view, the fact that the lessee of the
Property is a fraternity "house corporation" is without legal
significance, because a "public purpose" is motivating the University
in its use of the land.

As a corollary, the fact that the general public or even all
University students will not have use or access to the Property is not
relevant under *Prince George's County v. Collington Crossroads
Co., Baltimore v. State Department of Mental Hygiene*, and the other
controlling cases we have reviewed above. In this regard, the
facilities of the University itself are not open to everyone. The
University restricts its classrooms, laboratories, libraries, athletic
facilities, and administrative offices from use by the general public.
Nor are all University facilities and organizations open to all
University students. Membership and access to quarters used by
intercollegiate athletic teams, cheerleaders, bands, singing and
theater groups, and the campus newspaper, radio and television
stations are all limited. Moreover, several special housing facilities
are presently set aside for exclusive use by selected students. These
include the "Honors House," the "Language House," and the
"International House." These restrictions, however, do not mean
that the University is not pursuing an educational purpose in
providing these facilities. They do not render the facilities outside
of the "public use."

## V

## Conclusion

In summary, it is our opinion that a lease to the Kimball
Housing Corporation for the purpose of providing housing to
University students constitutes a "public" use of the Property.[7]

---

[7] It is not an element in our consideration whether student housing
of the particular type presently on the Property is the wisest or most

(continued...)

Because the Property is being directed to a "public" use, it is not subject to the zoning ordinances of Prince George's County.

J. Joseph Curran Jr.
*Attorney General*

John K. Anderson
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*

---

[7] (...continued)
efficient method of accomplishing the University's purpose. This is a matter of management reserved exclusively to the discretion of the University under its "Autonomy Act." §12-104 of the Education Article. *See* 59 *Opinions of the Attorney General* 695, 698-99 (1974).